[Cite as *State v. Pulley*, 2023-Ohio-3277.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29501 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 00303 |
| | : | |
| CHARLES F. PULLEY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on September 15, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ELIZABETH A. ELLIS, Attorney for Appellee

CHARLES M. BLUE, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant Charles F. Pulley appeals from his convictions for murder and endangering children after being found guilty by a jury of two counts of murder, felonious assault, two counts of endangering children, and involuntary manslaughter. The trial court merged some offenses and sentenced Pulley to a total of

18 years to life in prison.

{¶ 2} On appeal, Pulley raises nine assignments of alleged trial court error, including: denying funds for a false confession expert; overruling a motion to suppress; finding that Pulley knowingly, intelligently, and voluntarily waived his right to assistance of counsel; excluding relevant evidence; charging the jury with an incorrect statement of law; and sentencing Pulley for allied offenses of similar import. Pulley also contends that the verdicts were based on insufficient evidence, that the verdicts were against the manifest weight of the evidence, and that cumulative errors occurred, requiring reversal.

{¶ 3} After reviewing the record, we conclude that the trial court did not err in rejecting funding for a false confession expert. No reasonable probability existed that an expert would have aided Pulley's defense, and Pulley did not receive an unfair trial because he lacked assistance of such an expert. The trial court also did not err in overruling Pulley's motion to suppress, as Pulley knowingly, intelligently, and voluntarily spoke with police and there was no evidence of coercion. Furthermore, no error occurred concerning Pulley's waiver of assistance of counsel. The trial court thoroughly explained the dangers associated with this decision and held many status hearings to discuss Pulley's situation. Moreover, Pulley waived or abandoned his request for self-representation by asking standby counsel to assume representation after opening statements ended.

{¶ 4} We further find that the trial court did not commit error in refusing to admit text messages between Pulley and the murdered child's mother. Pulley invited any error because he knew of these texts when they occurred but failed to mention them until the

State had nearly finished its case. Pulley's complaint about jury instructions defining "acting recklessly" lacks merit as well. While the court used an outdated instruction reflecting the law before an amendment, the prior law actually imposed a higher burden on the prosecution. Pulley, therefore, was not prejudiced.

{¶ 5} The trial court also did not err in refusing to merge one charge of child endangering with the other offenses as an allied offense of similar import. The offenses were not allied, as they were committed during separate events and the harm caused was separate and identifiable. In addition, Pulley's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. Two prosecution experts testified as to the injuries and cause of the victim's death, and Pulley admitted that he had injured the victim. The State did not have to identify the precise way in which Pulley injured the child; instead, it could rely on circumstantial evidence, which was abundant.

{¶ 6} Trial counsel also did not render ineffective assistance by failing to subpoena the victim's mother or to call others to authenticate the text messages. Again, Pulley invited the situation by failing to disclose information to his attorney until the trial had nearly ended. Further, the record lacks any evidence about the basis of the decisions whether to recall the mother or to call other witnesses. Such decisions could have been based on trial strategy, which appellate courts will not second-guess. Finally, because no error occurred, there is no basis for finding cumulative error. Accordingly, the judgment of the trial court will be affirmed.

## I.   Facts and Course of Proceedings

{¶ 7} The charges against Pulley arose from the death of a six-week-old child, A.G., who allegedly sustained injuries while Pulley babysat her on August 19 and 20, 2020.   At the time, A.G.'s mother ("Mother") was dating Pulley, who was not A.G.'s father.

{¶ 8} Mother gave birth to A.G. on July 20, 2020, and the baby was healthy at birth. At the time, Mother was nearly 18 years old, and A.G.'s biological father chose not to be involved with the child.   When A.G. was four or five weeks old, Mother needed to return to work for financial reasons, and Pulley offered to care for A.G.   Transcript of Proceedings (Jury Trial) ("Trial Tr."), p. 373, 377, 379, 382, 392, 394-395, 396, and 397. Pulley lived in West Carrollton, Ohio, with his mother, had been around A.G. frequently, and had fed and cared for A.G. often at Mother's house.   As a result, Mother felt comfortable leaving A.G. with Pulley.   Pulley's house was only five or six miles away from the Kroger where Mother worked, so Mother would be available if Pulley needed anything. *Id.* at 374, 391-393, 397, and 399.

{¶ 9} On August 19, 2020, Mother and A.G. rode the bus to McDonald's and Pulley picked them up there.   They went to his apartment and then to GameStop so Pulley could pick up a new video game.   Pulley dropped Mother off at work around 2:00 p.m.   He was going to watch A.G. from 2:00 p.m. to 9:00 p.m. that day.   *Id.* at 398-399.

{¶ 10} When Mother left A.G. with Pulley, A.G. was perfectly fine.   A.G. had no injuries, bruises, lacerations, or contusions.   If Mother had any concerns, she would have told Pulley.   *Id.* at 399-400.   During the day, Mother texted with Pulley about how A.G. was doing.   Her impression from this was that nothing had occurred; she was not led to

believe A.G. needed help or that she needed to help Pulley with A.G.'s care.   *Id.* at 403-404.   That evening, Pulley dropped A.G. off at Kroger because Mother's step-father was going to pick her up from work.   Mother did not look in the car seat since A.G. was sleeping.   It was also dark outside.   When Mother got home, took A.G. out of the seat, and went to bathe her, she saw bruises on both sides of A.G.'s head.   *Id.* at 405-406.   The bruises were long, across A.G.'s whole forehead to her temple.   Mother called Pulley and asked if he had dropped something on A.G.'s head or had dropped her.   However, Pulley said that nothing had happened; he stated that maybe A.G. had hit her head on the car seat while Mother was on her way home.   Mother was not aware that anything like that had happened.   *Id.* at 406.

{¶ 11} When Mother got A.G. out of her bath, A.G. was a little bit fussy.   Mother just thought A.G. had a headache, and A.G. wasn't showing any signs of being really hurt.   Mother gave A.G. some Children's Tylenol and fed her.   A.G. ate fine and slept well all night.   Trial Tr. at 407-408.   The bruises worried Mother a little bit.   *Id.* at 409.   On the morning of August 20, 2020, A.G. woke up well and ate fine.   Mother was getting ready for work and had to be there at 1:00 p.m.   Pulley offered to watch A.G. again.   *Id.* at 421.   Everything was normal with A.G. that morning, and she was not fussy.   Mother still observed the bruises on A.G.    At the time, Mother felt comfortable taking A.G. back to Pulley, because she thought the car seat had to have caused the injury.   *Id.* at 422.

{¶ 12} That day, Mother had her car, so she drove A.G. to Pulley's house.   She left A.G. there, ran to get diapers and food from McDonald's, and came back.   Mother was supposed to work that day from 1:00 to 9:00 p.m.   When Mother left for work, A.G.

was eating and sleeping fine. *Id.* at 423-425. Pulley was the only one Mother saw at the apartment either day; Pulley's mother was not home. *Id.* at 424. After Mother had been at work for only four or five hours, Pulley texted her and said A.G. was "out of it." *Id.* at 425. Pulley then sent Mother a picture, and she rushed over to pick up A.G. and take her to the hospital. Before that, Mother and Pulley had texted; they communicated less than the day before, but the conversation was normal. *Id.*

{¶ 13} When Mother arrived, Pulley was holding A.G., and A.G.'s arms were straight out and would not stay down. *Id.* at 427. Mother had never seen A.G. like that before. *Id.* at 429. No one else was there other than Pulley and A.G., and A.G. was not really responsive. *Id.* at 430. Mother then rushed A.G. to the hospital, which took about 10 minutes. When Mother walked into the hospital, A.G. was actively seizing. *Id.* at 431.

{¶ 14} Hospital personnel rushed A.G. away and intubated her. When they finished, they took Mother to another room to talk to a social worker. Mother did not see A.G. from around 6:00 p.m. until around 3:00 a.m. Trial Tr. at 432-433. Pulley texted her to see how A.G. was, and she asked him what had happened. Pulley did not tell her anything; he said he did not know. *Id.* at 433. Mother stayed at the hospital until A.G. died on August 23, 2020. *Id.* at 434-435.

{¶ 15} A day or two before A.G. died, Pulley told Mother that the bruises on A.G.'s head on August 19, 2020, had been caused by him dropping his phone on her head; he also said A.G. had rolled off the couch. Furthermore, Pulley told Mother that on August 20, 2020, he had been dancing with A.G. and had tripped and hit her head on the

doorframe. Mother reported that to the police. *Id.* at 435-436. On Saturday, August 22, 2020, Pulley came to the hospital to apologize. All he said was that he was sorry and that it was not supposed to happen. *Id.* at 437. After that, Mother blocked Pulley from contacting her because she did not want to talk to him. *Id.* at 438.

{¶ 16} On August 20, 2022, Dr. Jonathan Thackery, a child abuse pediatrician and the chief medical officer of population health at Dayton Children's Hospital ("DCH") was the on-call pediatrician. *Id.* at 299-300 and 308-309. When A.G. was brought to DCH, there was a concern about child abuse, and Dr. Thackery was asked to evaluate A.G. due to the severity of her injuries. *Id.* at 309. When A.G. arrived at DCH, she was actively seizing and had a variety of symptoms and signs consistent with it. A.G. was sedated and a breathing tube was inserted. A.G. was then transferred to intensive care in extremely critical condition and would have died within a short time without medical intervention. *Id.* at 314-315.

{¶ 17} A CAT scan revealed swelling throughout the brain tissue, a subdural hemorrhage, a complex fracture of the left parietal skull, with multiple fractures, and bruising of a large majority of A.G.'s scalp. Trial Tr. at 316. According to Dr. Thackery, the injuries indicated a severe amount of force, not the kind where a child rolls off a bed or is dropped by a caregiver; children in motor vehicle accidents who are restrained do not show that kind of injury. *Id.* at 317. With this degree of injury, something would have been clearly wrong immediately, causing vomiting, unconsciousness, stopped breathing, seizure, or any combination of these symptoms. *Id.* at 318. The injuries and the child's response would be immediately apparent to a caregiver. *Id.* at 319. The doctor noted

that there were multiple facial impacts as well as a complete skull fracture of the left side of the skull, which could have been a single impact point accounting for a lot of injury. The doctor believed there were multiple impacts over time.   *Id*. at 320.

**{¶ 18}** Treatment was focused on maintaining A.G.'s blood pressure and breathing and trying to treat brain swelling that can lead to death.   *Id*. at 320-321.   A cell phone falling three or four feet onto A.G.'s head would not have caused that level of injury, nor would the injuries have been caused by a child falling from a standard sized couch onto the floor or a person dancing, swinging with the baby and striking a door frame, or any type of routine care or accidental injury.   *Id*. at 322.   The injuries were consistent with child abuse.   *Id*. at 338.   Dr. Thackery stated he "would expect the same constellation of injuries in a severe highly traumatic incident."   *Id*. at 338-339.

**{¶ 19}** On August 20, 2020, West Carrollton patrol officer Michael Holtrup was called to DCH about the incident involving A.G.   Detective Lawson also came to the hospital.   After they spoke with Mother, she gave them permission to take photos of a text chain between Mother and Pulley, which included photos of A.G.   *Id*. at 479, 481, and 483-484.   Holtrup and Lawson then went to Pulley's home.   *Id*. at 484.   Holtrup waited outside and eventually transported Pulley to the police station, where the investigation continued in an interview room.   *Id*. at 485-486.

**{¶ 20}** Det. Lawson read Pulley *Miranda* warnings before the interview, and Pulley signed a form waiving his rights and agreeing to talk to the police.   Trial Tr. at 500 and 504.   During the interview, Pulley gave inconsistent stories about what had occurred during the two days he babysat.   First, he said that nothing had happened the first day

and that A.G. did not have any bruises when she left his care. *Id.* at 512-513. Regarding the second day, Pulley relayed a convoluted story about various times A.G. was fed and slept, and then would not eat, was stiff, and kept looking to the right. *Id.* at 514-518. Pulley denied causing any injury to A.G. *Id.* at 519.

{¶ 21} Later in the interview, Pulley stated that on the first day, he had placed a game controller on the couch and went to make A.G. a bottle. At the time, A.G. was on the floor. The controller fell off the couch and hit A.G., causing bruises on the front and side of her head. *Id.* at 521 and 524. Pulley then told the police that on the second day, he did not have A.G. properly placed while they slept on the couch. As a result, A.G. fell off the couch feet first, hit the back of her head, and started screaming very loudly. *Id.* at 526-528. When Det. Lawson stated that due to its extent, the injury could not have happened that way, Pulley said that A.G. may have fallen on his speaker or some metal boxes because he had a lot of things scattered across the floor. *Id.* at 530-531.

{¶ 22} Pulley also wrote out a statement for the police. *Id.* at 545-546 and State's Ex. 49. In the written statement, Pulley said that on the first day, he went to take a picture of A.G. and dropped his phone on her. A few hours later, A.G. fell out of his hands onto the floor causing a bruise to the side of her face. *Id.* at 547. On the second day, when he was playing with A.G., he did a spin with her in his hands and accidentally hit the left back side of her head. *Id.*

{¶ 23} At that point, the police returned to Pulley's home so he could reenact what had occurred. The police also took photos, including the door jamb that A.G.'s head allegedly struck. Trial Tr. at 548-449 and 552, and State's Exs. 41 and 43. The police

took videos of Pulley's demonstrations of having the baby in his arms and dropping a cell phone on the baby, falling asleep on the couch and the baby's falling, and holding the baby and spinning into the door jamb. Trial Tr. at 553. During these demonstrations, Pulley did not show that he had dropped a controller on A.G.'s head. *Id.* at 556. Det. Lawson counted nine or 10 different explanations of how A.G. was injured. *Id.* at 556-557. After the demonstrations ended, Det. Lawson went back to DCH and found that A.G. was still in critical condition. Pulley was not arrested that night. *Id.* at 559.

{¶ 24} On August 21, 2020, Pulley went to work at Kroger (where he and Mother both worked). Pulley texted S.W., who was a Kroger supervisor for both Mother and Pulley, and asked if S.W. had heard about Mother and her baby. *Id.* at 341-344. S.W. asked Pulley to step outside, and Pulley told her in detail what had happened. *Id.* at 345. Pulley stated that he had been babysitting A.G. for Mother while she worked, and A.G. had been extremely fussy. Pulley could not calm A.G. down, so he had danced with her, trying to soothe her. A.G. had been wrapped in his arms. Pulley said he kind of got dizzy, tripped over his feet, and hit the back of A.G.'s head on the refrigerator. Pulley demonstrated it. *Id.* at 346. Later the same day, they discussed the incident again, and Pulley mentioned it was a door frame instead of a refrigerator. *Id.* at 347.

{¶ 25} The following evening, S.W. got Pulley's address and went to his home to talk to him. Something did not sit right, and she thought she might obtain more detail in an environment that was not professional. *Id.* at 349. At that time, Pulley was very quiet and upset and there was not much interaction. All Pulley said was that he had not told S.W. everything, that he was not able to get everything out, and that he did not know how

to tell Mother what had happened.  *Id.* at 350.

**{¶ 26}** Det. Lawson was informed on August 23, 2020 that A.G. had died, but the police did not receive the full autopsy report until the end of January or very early February 2021.  No one was arrested in the interim.  Trial Tr. at 560-561.  Dr. Castiglione-Richmond ("Dr. Richmond"), a forensic pathologist with the Montgomery County Coroner's Office, and her supervisor, Dr. Castro, performed A.G.'s autopsy.  *Id.* at 248-249 and 253.  During the autopsy, Dr. Richmond noted bruises on the right side of the forehead and over the eye on the left side.  These bruises were separate and distinct and were not part of one large injury.  *Id.* at 260-261.

**{¶ 27}** Dr. Richmond also observed an abrasion or some sort of scrape mark on the back of A.G.'s head and shaved the head to better visualize it.   A little bit on the right, almost in the middle of the back of the head, was a big bruise associated with the scrape mark.   The scrape mark was part of a larger injury, and the injury had been potentially caused by blunt force trauma.  *Id.* at 262-265.  A.G. also had the following interior injuries: bruising of all of the anterior scalp; bruising of the temporalis muscles on each side of the head; bruising of the posterior part of the scalp on the right side; and bruises almost all one unit involving the entire scalp.  *Id.* at 265-269.   The bruises were layered one upon another and there were multiple impact points.  *Id.* at 268.

**{¶ 28}** The bruising on the left scalp was quite extensive, and on the left side, the doctor was beginning to see a skull fracture.  The fracture was linear, with fractures radiating outward from it.   For a fracture of this nature to occur, an excessive amount of force would have had to be applied.  *Id.* at 269-270.  Dr. Richmond equated the force

with events like a child falling from a multi-story building or a motor vehicle collision. This fracture in particular would have caused significant internal brain injury, i.e., "extensive and diffuse catastrophic injuries," meaning the injuries were not compatible with life. *Id.* at 271-272. With an injury of this magnitude, the baby would cry, and neurological compromises would develop within minutes, including seizures, where the body would shake or be nonresponse to external stimuli, and sometimes the eyes would be deviated. *Id.* at 272-273.

{¶ 29} According to the doctor, A.G., at six weeks, was too young to cause these injuries to herself. She had no injuries or broken bones below the neck and was otherwise healthy. Trial Tr. at 277-278. The doctor stated that the cause of death was blunt force trauma, and the manner of death was homicide. *Id.* at 288-289. In addition, the doctor watched the videos the police had made of Pulley's various explanations of how A.G. was injured and found they did not explain the extent of her injuries.

{¶ 30} On February 4, 2021, an indictment was filed charging Pulley with the following crimes: murder (proximate result), an unclassified felony; felonious assault (serious harm), a second-degree felony; murder (proximate cause), an unclassified felony; endangering children (serious physical harm), a second-degree felony; manslaughter, a first-degree felony; and endangering children (parent-serious harm), a third-degree felony.

{¶ 31} After Pulley pled not guilty, the court imposed a $1,000,000 surety bond. The court initially appointed counsel, but Pulley then retained private counsel. On February 22, 2021, defense counsel acknowledged receipt of the State's discovery

packet, which contained a flash drive of various items, including "Cell Phone Examinations – 20-123 and 20-124," and "Cell Phone – texts/pics." On February 23, 2021, counsel filed a motion to suppress any statements Pulley had made, and the motion was set for hearing on March 26, 2021. The court also set a trial date of September 13, 2021.

{¶ 32} On August 10, 2021, Pulley filed a motion for an order authorizing a confession expert to interview Pulley at the State's expense. The State then provided supplemental discovery (a supplemental post-mortem exam report of Drs. Castro/Richmond) to Pulley on August 19, 2021, and Pulley then moved to continue the trial based on the need to decide if an expert was needed for the new discovery. On September 16, 2021, Pulley filed an addendum to his motion, seeking funds for the confession expert and for an expert medical witness on A.G.'s injuries and cause of death.

{¶ 33} At a September 17, 2021 hearing, the court orally overruled the motion for a confession expert and said it would take the medical expert request under consideration. The court set a new trial date for December 20, 2021.

{¶ 34} On September 22, 2021, the court filed an order allowing Pulley $4,000 for expert assistance by a forensic pathologist. The same day, the court formally overruled the motion for a confession expert and the suppression motion. A few days before the December 2021 trial date, Pulley filed a pro se "motion to dismiss/drop" the murder charge. Attached to the motion were numerous IRS and Uniform Commercial Code forms listing the trial court judge, common pleas court, prosecutors, and so forth as fiduciaries and "assignors"; an "affidavit of truth of autochthonous private protected civilian

status" signed by Pulley; various documents from the Ohio Secretary of State concerning a "Charles Francis Pulley Trust"; and a power of attorney allegedly signed by Pulley.

{¶ 35} On December 17, 2021, Pulley's attorney signed for further discovery from the State regarding 38 pages of "CCH's" for several State witnesses. Then, on the day of trial, Pulley's attorney filed a motion for continuance because Pulley wished to represent himself. The court continued the matter to January 13, 2022. Prior to that time, the court filed an order striking Pulley's pro se motion and exhibits from the record. However, Pulley filed additional pro se materials before the January 13 hearing.

{¶ 36} The court held a waiver of right to counsel hearing on January 13, 2022, during which the court advised Pulley of his rights and the consequences of representing himself. *See* Transcript of Proceedings (Motion to Suppress, Waiver of Right to Counsel, Status Hearing ("Pre-Trial Tr. 1"), 43-78. During the hearing, Pulley signed a waiver of his right to counsel, and the court also let Pulley's counsel withdraw. *Id.* at 75-77. The written waiver was filed the same day, and the court filed an entry on January 14, 2022, allowing the withdraw of counsel. The court then appointed stand-by counsel for Pulley and held a status hearing on February 15, 2022.

{¶ 37} During this hearing (at which standby counsel, Mr. Baldwin, was present), the court said it would hold status hearings around every three weeks because Pulley was proceeding pro se. *Id.* at 79. At that time, the State said it had given full discovery to Pulley's prior counsel and had now also given full discovery to Baldwin, Pulley's conduit. *Id.* at 81-82. At that time, Baldwin agreed that he had received full discovery from the State. Baldwin also said that some discovery was electronic and some was

paper, that he had met with Pulley, who did not want to keep a copy at the jail, and that he had offered to meet with Pulley whenever Pulley wished to review discovery. *Id.* at 83. In addition, Pulley stated that he had told Baldwin he would contact him when he needed the discovery. *Id.* at 83-84.

{¶ 38} During this hearing, the court also addressed a motion Pulley had filed on February 9, 2022, seeking full discovery. *Id.* at 84-85. Pulley stated at the hearing that he was not able to say what was missing and would have to go through the discovery to find out. *Id.* at 86. The court advised Pulley that he would have to be able to provide a complete list of what was missing at the next status hearing. *Id.* During the hearing, the court asked Baldwin if he had reviewed the discovery and would be prepared to proceed with trial if Pulley decided not to represent himself. Baldwin said that was correct. *Id.* at 90-91.

{¶ 39} A further status hearing was held on March 3, 2022. In the interim, Pulley had filed several motions. At the hearing, the court stated that any further motions would have to be filed by March 31, 2022. Pre-Trial Tr. 1 at 101. Due to Pulley's repeated failure to respond to questions that were asked, the court said another hearing would be held on Pulley's waiver of the right to counsel. *Id.* at 105.

{¶ 40} On April 4, 2022, the court held another status conference. At that time, the court provided Pulley with an initial draft of the jury instructions and stated Baldwin would also be given a copy. Transcript of Proceedings (Status Conference) ("Status Tr."), 3. During this hearing, Pulley reiterated that he wanted to continue to represent himself. *Id.* at 8.

**{¶ 41}** The final pretrial was held on May 9, 2022. At that time, the court again discussed with Pulley if he wished to continue representing himself, and Pulley said he did. *Id.* at 23-26. The court also confirmed that standby counsel was prepared to go forward if Pulley requested. *Id.* at 24. Before trial, Pulley filed more motions, including a motion requesting discovery (on May 16, 2022), and a motion to disqualify the trial judge (on May 20, 2022). The court denied the latter motion the first day of trial and followed that with a written decision. Trial Tr. at 112-113, and Order and Entry Overruling Motion for Disqualification (May 24, 2022).

**{¶ 42}** After Pulley failed to pose any questions to jurors during voir dire or to make an opening statement, the court again asked Pulley if he wanted to continue to represent himself. Trial Tr. at 236. Pulley then elected to have Baldwin represent him, and the trial proceeded in that fashion. During trial, Pulley filed a pro se affidavit of disqualification, again attempting to have the trial judge recuse, and this matter was denied as well. *See* Decision Order and Entry Overruling Affidavit of Charles F. Pulley III for Disqualification and Recusal (May 26, 2022), and Trial Tr. at 596.

**{¶ 43}** Following the presentation of evidence, the jury found Pulley guilty of all offenses as charged. During sentencing, the court merged the first five offenses, and the State elected to have Pulley sentenced for murder, which resulted in a mandatory prison term of fifteen years to life. The court found that the remaining offense, endangering children (parent-serious harm), did not merge, and it sentenced Pulley to a three-year term on that charge to be served consecutively to the murder sentence. This timely appeal followed.

## II. Denial of Motion for Expert Funds

**{¶ 44}** Pulley's first assignment of error states that:

The Trial Court Violated Appellant's Due Process in Violation of His Rights by Denying His Motion for Funds to Obtain a False Confessions Expert at State Expense.

**{¶ 45}** Under this assignment of error, Pulley contends that the trial court abused its discretion in denying his request for a confession expert because he had demonstrated a reasonable probability that the expert would aid in his defense. In denying the request for expert funds, the court found that Pulley had "failed to make a particularized showing of a reasonability probability that the requested expert would aid in his defense, and that denial of the requested expert assistance would result in an unfair trial." Decision, Order and Entry Overruling Motion for Expert Assistance of Confession Expert (Sept. 22, 2021), p. 3. The court further found that due to the existence of audio and video recordings of Pulley's statements, assessing reliability was not beyond the jury's knowledge or expertise. *Id*. at p. 4.

**{¶ 46}** We have previously distinguished between voluntariness of confessions, which trial judges decide, and reliability of confessions, which is a jury issue. *State v. Stringham*, 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, ¶ 28. In that case, the defendant claimed the trial court had erred in excluding testimony from an expert on false confessions. *Id.* We agreed with the trial court that the confession had been voluntary and had not been the result of a *Miranda* violation. *Id.* at ¶ 26. However, on the issue

of the expert's exclusion, we commented that:

> "The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise ... unworthy of belief.' Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility."

*Id.* at ¶ 29, quoting *Crane v. Kentucky*, 476 U.S. 683, 688-689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

**{¶ 47}** We further noted *Crane's* observation that " '[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or

Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." ' " *Id.* at ¶ 31, quoting *Crane* at 690. Thus, " '[t]hat opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.' " *Id.* Because the trial court in *Stringham* had excluded the expert's testimony solely on the basis of voluntariness while reliability was central to the defense, we found the trial court had erred. *Id.* at ¶ 42.

{¶ 48} Notable differences exist here, however. First, unlike the case before us, *Stringham* involved exclusion of expert testimony at trial, after the defense first questioned the expert outside the jury's presence to decide admissibility. The trial court initially found much of the testimony admissible, then changed its mind on reconsideration. At that point, the defense made a detailed proffer of the testimony. The testimony included analysis of the particular defendant. *Id.* at ¶ 26-27. Here, in contrast, no expert affidavit was submitted, nor did Pulley submit a proffer. As will be noted, only general statements were made.

{¶ 49} More importantly, the issue here differed, as it concerned whether the trial court was required to pay for expert testimony. In this context, a defendant's rights are more limited. "Due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the

defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." *State v. Mason*, 82 Ohio St.3d 144, 144-145, 694 N.E.2d 932 (1998), syllabus, *approving and following State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682 (1988).

{¶ 50} "In making this determination, the court must consider '(1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided.' " *State v. Campbell*, 90 Ohio St.3d 320, 327, 738 N.E.2d 1178 (2000), quoting *Mason* at 149. "A defendant must show not just a mere possibility but a reasonable probability that an expert would aid in his defense." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 223, citing *Broom* at 283.

{¶ 51} Since the matter was within the trial court's sound discretion, we review for abuse of discretion. *Mason* at 150. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if they are not supported by a sound reasoning process. *Id.*

**{¶ 52}** The Supreme Court of Ohio has held it "axiomatic" that " '[n]o court - not a trial court, not an appellate court, nor even a supreme court - has the authority, within its discretion, to commit an error of law.' " *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38, quoting *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.). *Accord State v. Kocevar*, 2d Dist. Montgomery No. 29483, 2023-Ohio-1513, ¶ 24.[1]

**{¶ 53}** Having reviewed the record, we find no abuse of discretion on the trial court's part with respect to refusing to pay for an expert. First, the motion seeking an expert in confessions did not state any specific reason why such an expert was needed, other than counsel's belief (without explanation) that she had "probable cause to suspect that utilization of this particular expert will produce exculpatory evidence." Motion for Expert Assistance of Confessions Expert, p. 2. This is not a particularized showing; in fact, there was no particularity. Furthermore, nothing substantive was presented in the addendum that Pulley later filed, other than generalized statements such as "[w]ithout an expert, the Defendant will be unable to have any testimony regarding the kinds of situations that often result in false confessions," and that without an expert in that field,

---

[1] This is contrary to the State's assertion that an abuse of discretion is "more than an error of judgment, but instead demonstrates 'perversity of will, passion, prejudice, partiality, or moral delinquency.' " State's Brief, p. 8, quoting *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993). To the extent the State is equating an "error of judgment" with an "error of law" (while attempting to avoid using the discredited term "more than an error of law"), the Supreme Court clearly stated in *Johnson* that trial courts are not free to make errors of law. A "judgment" is synonymous with a "ruling" or holding," i.e., a legal decision. *See* https://www.merriam-webster.com/dictionary/judgment (accessed August 8, 2023). Furthermore, a lack of sound reasoning does not require perversity of will, prejudice, moral delinquency, and so forth. A trial court decision can be based on unsound reasoning without demonstrating these characteristics.

"Defendant's trial will be unfair." Addendum to Motion for Expert Assistance, p. 2. Nothing was added in the way of specifics during the motions hearing. *See* Transcript of Proceedings (Motions Hearing, Final Pre-Trial Conference) ("Pre-Trial Tr. 2"), 5. These are general comments about possibilities, not about reasonable probabilities. In addition, there was no showing that Pulley would receive an unfair trial without such assistance.

{¶ 54} Having reviewed the record, we find no basis for concluding that exculpatory evidence existed, that there was a reasonable probability that a confession expert would have aided Pulley's defense, or that Pulley received an unfair trial because he did not have the assistance of such an expert. Accordingly, the first assignment of error is overruled.

### III. Motion to Suppress

{¶ 55} Pulley's second assignment of error states that:

The Trial Court Erred in Overruling the Appellant's Motion to Suppress.

{¶ 56} Under the second assignment of error, Pulley contends that the trial court erred in denying his motion to suppress because it did not consider the totality of the circumstances, like his lack of experience with law enforcement, his lack of a criminal history, his age, and his mental state. According to Pulley, he had been barely over 18 years of age, had been emotionally distraught and inexperienced with law enforcement, and the police had taken advantage of his emotional state.

{¶ 57} In its decision, the trial court noted that it had viewed the videos of Pulley's interviews with the police.   The court found that Pulley had not been in custody when he spoke with police, that *Miranda* warnings were administered anyway, and that, under the totality of the circumstances, Pulley had knowingly, voluntarily, and intelligently waived those rights. Decision, Order and Entry Overruling Motion to Suppress (Sept. 22, 2021) ("Suppression Dec."), p. 6.   After considering the totality of the circumstances, the court also found that Pulley's statements to police had been voluntarily made, that he had not been unduly influenced to talk or in distress, and that he had willingly conversed with the police.   *Id.* at p. 7-8.

{¶ 58} "Appellate review of a motion to suppress presents a mixed question of law and fact.   When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.   Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.   Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.)   *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

{¶ 59} "[W]hether a confession is voluntary and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings are analytically separate issues."   *Stringham,* 2d Dist. Miami No. 2002-CA-9, 2003-Ohio-1100, at ¶ 10, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000),

and *State v. Chase*, 55 Ohio St.2d 237, 246, 378 N.E.2d 1064 (1978). "While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances." *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). *Accord State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, ¶ 24; *State v. Smith*, 2d Dist. Montgomery No. 24264, 2011-Ohio-3288, ¶ 20. "To determine whether a valid waiver occurred, we 'consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus.

{¶ 60} "However, the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 71, citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). As a result, courts "need not assess the totality of the circumstances" unless they "first find that the detectives used a coercive tactic." *Id.*, citing *State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001). Coercive police tactics include "physical abuse, threats, or deprivation of food, medical treatment, or sleep." *Wesson* at ¶ 35.

{¶ 61} Here, *Miranda* warnings were not required because Pulley was not in custody. Nonetheless, the police did provide Pulley with the warnings. "Even when

*Miranda* warnings are not required, a confession may be involuntary and subject to exclusion if, under the totality of the circumstances, the defendant's will was overborne by the circumstances surrounding the giving of his confession." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 11, citing *Dickerson* at 434. "The State must prove by a preponderance of the evidence that a defendant's confession is voluntary." *State v. Knight*, 2d Dist. Clark No. 2004-CA-35, 2008-Ohio-4926, ¶ 107, citing *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

{¶ 62} As a preliminary point, the trial court did specifically say it had considered the totality of the circumstances. Suppression Dec. at p. 6. While the court did not specifically mention Pulley's age (18), the court said there was no evidence in the record that Pulley was naïve. *Id.* In evaluating the court's decision, we have reviewed the suppression transcript as well as all the interview videos.

{¶ 63} The evidence elicited at the suppression hearing indicates that Detective Lawson had been with the West Carrollton Police Department for 18 years. Pretrial Tr. 1 at 6-7. After being summoned to DCH on August 20, 2020, Lawson spent several hours there investigating. He learned from Mother that Pulley had watched A.G. on the 19th and 20th of August. He and several officers then went to Pulley's home to talk about the incident. *Id.* at 8-10. When they arrived, Lawson told Pulley that he wanted to talk with him, and they explained to Pulley's mother why they were there. Pulley then agreed to go to the police station. Pulley was not in custody, nor was he in handcuffs. *Id.* at 11.

{¶ 64} The police transported Pulley to the station, as he did not have a ride.

When they arrived, Lawson took Pulley into an interview room. The interview was recorded and the process began around 1:30 a.m. *Id.* at 11-14. Pulley was not in handcuffs, the door was not locked, and Pulley could have left at any time. Lawson then read Pulley's rights to him, asking if he understood them. Pulley initialed each right and signed the rights form. At the time, Pulley had completed 12 years of school, including four years of high school. *Id.* at 14-16. Lawson asked Pulley if he was under the influence of anything and if he knew why he was there. Pulley said he understood why he was there and was not under the influence of any substance. *Id.* at 15-16. After Pulley completed the form, he agreed to speak with Lawson. *Id.* at 17.

{¶ 65} The actual interview began around 1:40 a.m. Lawson did not see any signs of intoxication or that Pulley was under the influence of anything. Pulley spoke and understood the English language, was oriented to time and place, never indicated he was confused or unable to proceed, did not invoke any rights, and did not ask for a lawyer. *Id.* at 19-21. The interview lasted about an hour, and then Pulley spent 15-20 minutes writing out a statement. Pulley was given an opportunity to use the restroom and was given a bottle of water at the beginning of the interview. *Id.* at 21. The police did not threaten Pulley nor did they make any promises. *Id.* at 24.

{¶ 66} After the interview, the police went to Pulley's home, where Pulley voluntarily demonstrated how he injured A.G. Again, at no time did Pulley invoke any *Miranda* rights or ask for an attorney, nor did the police make any promises or threaten him. *Id.* at 25-26 and 28.

{¶ 67} The interview videos also show no evidence of police coercion. During the

interviews, the police were cordial and Pulley did not appear to be confused or incapable of understanding what was occurring at any time. At the very end of the interview, after admitting that he had injured A.G. on two separate days and after writing a statement, Pulley appeared to be slightly upset (although it was somewhat difficult to tell, as his head was bowed). Given that A.G. was in critical condition and that Pulley had injured her, distress would be normal. Pulley did not appear upset or in any emotional state when he subsequently showed the police (at his home) how A.G.'s injuries were caused.

{¶ 68} In any event, the trial court's decision was supported by competent, credible evidence, and the facts satisfied the pertinent legal standards. Accordingly, the second assignment of error is without merit and is overruled.


IV. Waiver of Right to Assistance of Counsel

{¶ 69} Pulley's third assignment of error states as follows:

The Trial Court Erred in Finding Appellant Made a Knowing, Intelligent, and Voluntary Waiver of His Right to Assistance of Counsel.

{¶ 70} Under this assignment of error, Pulley argues that the trial court erred in accepting his waiver of counsel because he filed motions with the court that were nonsensical and also demonstrated during various hearings that he did not understand the legal process, made irrational statements like saying that he wanted a " 'plea in abatement' " and " 'to revoke all keys and contracts,' " and essentially had no idea how to represent himself. Appellant's Brief at p. 22. In response, the State contends that Pulley's former counsel had no concerns over his competence, that the trial court could

not have been more thorough in protecting Pulley's rights, that Pulley stated off the record that he was "playing a game of chess," that Pulley could not show prejudice because he elected to be represented by counsel once the trial began, and that counsel was experienced with this kind of case and was prepared for trial. State's Brief at p. 9-21. Having reviewed the record, we agree with the State.

{¶ 71} Under the Sixth Amendment, accused parties have the right to make a personal defense, i.e., to represent themselves. *Faretta v. California*, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Ohio Constitution provides a similar independent right. *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 24. "Once the right to counsel is properly waived, trial courts are permitted to appoint standby counsel to assist the otherwise pro se defendant." *Id.* at ¶ 28. However, "there is no constitutional right to standby counsel." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 13.

{¶ 72} If serious offenses are involved as defined by Crim.R. 2(C), "when a criminal defendant elects to proceed pro se, the trial court must demonstrate substantial compliance with Crim.R. 44(A) by making a sufficient inquiry to determine whether the defendant fully understood and intelligently relinquished his or her right to counsel." *Martin* at ¶ 39, citing *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (2005), paragraph two of the syllabus.

{¶ 73} No precise script or formula has been proscribed for this. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 101. " 'The information a defendant must possess in order to make an intelligent election * * * will depend on a

range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.' " *Id.*, quoting *Iowa v. Tovar*, 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004). However, "[a] criminal defendant must 'unequivocally and explicitly invoke' the right to self-representation." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 29, quoting *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 38. Pulley did this here, on every occasion it was discussed, until he decided after opening statement that he wanted his stand-by counsel to take over representation. Trial Tr. at 236.

**{¶ 74}** "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525, 45 L.Ed.2d 562, quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). *Accord Obermiller* at ¶ 30.

**{¶ 75}** As noted, Pulley initially had appointed counsel and then retained private counsel. However, on the day of the December 20, 2021 trial, counsel asked for a continuance because Pulley wanted to represent himself. The trial court therefore continued the trial and conducted a lengthy hearing on January 13, 2022, during which the court clearly explained the perils of self-representation. Nonetheless, Pulley insisted on the course he had chosen, after which the court allowed Pulley to represent himself

and a written waiver was filed. *See* Pre-Trial Tr. 1 at 43-78 (Jan. 13, 2022). The court also appointed stand-by counsel for Pulley. Thereafter, the court conducted several status hearings, during which it further advised Pulley about his rights, discussed Pulley's lack of understanding of legal procedures, and continually cautioned Pulley that his lack of knowledge was handicapping him and he would be better served by having counsel. *See* Pre-Trial Tr. 1 at 85 (Feb. 15, 2022), 96-101 and 105-106 (March 3, 2022); Status Tr. at 4-5, 8, 19-27, and 31-34 (Apr. 4, 2022), and Pre-Trial Tr. 2 at 23-26 (May 9, 2022). During all these hearings, Pulley was adamant that he wanted to represent himself.

{¶ 76} The court also ascertained that stand-by counsel was prepared for trial and could replace Pulley, if Pulley chose. Pre-Trial Tr. 1 at 90-91 and Pre-Trial Tr. 2 at 24. In addition, both Pulley's former retained counsel and his stand-by counsel indicated that they did not have concerns about Pulley's competence to stand trial. Pre-Trial Tr. 1 at 43-44, and Status Tr. at 26 and 30. The record could not be clearer regarding the fact that the court did everything it could to fully advise Pulley of his rights and to protect his interests, while Pulley refused to listen or heed the court's advice. This is consistent with the instruction that "a trial judge 'must investigate [a defendant's request for self-representation] as long and as thoroughly as the circumstances of the case before him demand.' " *Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, at ¶ 42, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723-724, 68 S.Ct. 316, 92 L.Ed. 309 (1948).

{¶ 77} According to the transcripts, the trial court also asked Pulley about a remark he had allegedly made while leaving the courtroom to the effect that he was "playing a game of chess" and "was going to win." Pre-Trial Tr. 1 at 44-45 (Jan. 13, 2022). The

court stated that the remark had been made to a deputy and was also overheard by another judge, both of whom had reported the remark to the court. The court then stressed that the trial process is not a "game of chicken" or a "game of winning" and that Pulley was the only person facing consequences, which were grave. *Id.* at 45. Pulley denied making the remarks and insisted that he still wished to represent himself. *Id.*

**{¶ 78}** "Finally, even if a defendant has made an unequivocal and explicit request for self-representation, a defendant may later waive that request by acquiescing in counsel's representation." *Obermiller* at ¶ 31, citing *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 42, citing *McKaskle v. Wiggins*, 465 U.S. 168, 182, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Pulley therefore waived or abandoned his request for self-representation when he asked for stand-by counsel to represent him after opening statements.

**{¶ 79}** In light of the preceding discussion, Pulley's third assignment of error is overruled.

## V. Exclusion of Evidence

**{¶ 80}** Pulley's fourth assignment of error states that:

The Trial Court Denied Appellant's Constitutional Right to Present

Evidence by Excluding Relevant Evidence.

**{¶ 81}** Under this assignment of error, Pulley contends that the trial court erred by refusing to admit text messages between Mother to Pulley, during which Mother made statements about wanting to " 'throw [A.G.] against the f***ing wall if she doesn't shut the

f*** it [sic],' " and that Mother felt she was a " 'horrible mother' " * ** and [A.G.] deserves someone better, * * * someone that wouldn't hurt her bc they were angry.' " Appellant's Brief at p. 26, quoting from text messages allegedly written, respectively, on August 13, 2020, and August 15, 2020. According to Pulley, the texts were relevant for purposes of establishing an alternate theory that Mother was the source of some injuries to A.G. and to impeach Det. Lawson's statement that there was no evidence that Mother was responsible for any of A.G.'s injuries. *Id.* at p. 25 and 27. Pulley contends that the trial court erred in finding that the text messages could not be authenticated by Lawson, who was testifying at that point and was the State's last witness. Trial Tr. at 533.

{¶ 82} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court * * *." (Citation omitted.) *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50. This would again mean review for abuse of discretion, which includes decisions that lack a sound reasoning process. *AAAA Ents., Inc.*, 50 Ohio St.3d at 161, 553 N.E.2d 597.

{¶ 83} To put this issue in the proper factual context, we note several items, most of which were mentioned above in the Statement of Facts: (1) more than a year before trial, Pulley's retained counsel received the State's discovery packet, which included a flash drive of various items including cell phone examinations and cellphone "texts/pics"; (2) during the February 15, 2022 hearing (which was more than three months before trial), the State had given full discovery to Pulley's appointed stand-by counsel as a conduit for Pulley. At that time, Pulley did not want to keep a copy at the jail and said he would contact the attorney when he needed the discovery; and (3) in a pro se pleading filed on

February 28, 2022, Pulley alleged that Mother had made "incriminating and misleading statements" and that Mother "never wanted this baby, which is also addressed in her '**cell phone text messages**.' " (Emphasis sic.) Affidavit of Charles F. "Based on Truth and Facts," p. 8. At that time, Pulley also alleged that his counsel had not released, shared, or discussed full discovery with him. *Id*.

{¶ 84} Further relevant facts included that, during the March 3, 2022 status hearing, the discovery issue arose again, and standby counsel Baldwin again assured the court that he had spoken with Pulley and that, while complete discovery was available, Pulley did not want discovery at the jail. Pre-Trial Tr. 1 at 104. Pulley again said he would advise Baldwin if he wanted the discovery. *Id*. at 104-105. Additionally, during the April 4, 2022 status hearing, the court stated that Pulley had previously been provided "all of the discovery" and that it appeared it was sitting on Pulley's table. Status Tr. at 5. Pulley confirmed this was correct. *Id*.

{¶ 85} Later, Pulley reiterated that he did not believe the State had failed to turn over any discovery to him, other than a witness list (which was not yet due). *Id*. at 7-8. At this time, the State noted that it had given Pulley's retained counsel full discovery, had done the same with Baldwin, with a few additions, and "in abundance of caution, * * * [had] now provided a -- * * * third complete paper discovery packet to the Defendant that is sitting on his table." *Id*. at 8-9. Pulley acknowledged that he had received a "full and complete copy of all paper discovery." *Id*. at 9-10. *See also id.* at 27. During that hearing, the trial court again discussed self-representation and the need to be prepared for trial, and Pulley said he would be prepared for the May 23, 2022 jury trial. *Id*. at 32-

34.

{¶ 86} Other facts include that during the May 9th, 2022 final pretrial, the State reported that it had received a request that day from Pulley asking to view his cell phone, which the police had taken at the time of arrest. The State further noted that it did not intend to introduce the phone as an exhibit, but the State could work out something with the stand-by attorney. Pre-Trial Tr. 2 at 15-16. At that time, Pulley stated that he wanted to go through his phone, as it was "pretty important." *Id.* at 19. This was about two weeks before trial.

{¶ 87} The final facts are that on May 16, 2022 (a week before trial), Pulley signed a receipt for discovery relating to a download of all documents printed from a phone (four pages). He also filed a motion to compel based on the State's alleged failure to comply with discovery and withholding of exculpatory evidence. This related to "extracted data of text messages by TFO Robert Bell from [Mother] & her two cell phones" and Pulley's two cell phones. May 16, 2022 Motion to Compel, p. 1. According to Pulley, there were "self-incriminating" text messages on Mother's phone that the West Carrollton police officers should have had in their possession. However, Pulley would have been aware since the time of the crime (around 21 months before trial) that these allegedly "incriminating text messages" could be found either on his own phone or Mother's phone.

{¶ 88} Rather than mentioning these "important" facts to his attorneys, Pulley waited until the second day of trial, after Mother had testified, to tell his former stand-by attorney and now counsel about this information. As indicated, during the testimony of the last State's witness, defense counsel informed the court that, over the lunch break,

Pulley's father had handed him copies of messages between Pulley and Mother, which showed messages that had been deleted from what the police took screenshots of at DCH (i.e., Mother's phone) and additional text messages that were relevant to whether Mother could have been involved in the injuries to the child. Trial Tr. at 533. The implication was that Mother had deleted the messages before the police took screenshots, and Pulley's phone had had the complete texts. Also, Pulley had taken the copies given to him on May 16 and had provided those to his father. *Id.* at 533 and 536-538. The State noted that the documents in question had been in the possession of Pulley's retained attorney since the original discovery was released and that, while the State normally does not print out downloads due to the volume of material on phones (and has no obligation to do so), the State had printed out 5,000 pages and had given them to Pulley on May 16, 2022. *Id.* at 536-537.

{¶ 89} The court concluded that the State had done nothing wrong and that Pulley had created the problem by failing to disclose this information to his attorney. The court stressed that this appeared to be another tactical choice by Pulley and his father. *Id.* at 539-541. At that point, the State made a liminal motion to prevent Pulley from cross-examining Det. Lawson about the texts. *Id.* at 541-542. The court granted the motion based on authentication and hearsay grounds. *Id.* at 542-543. Before court resumed, the defense asked for leave to subpoena Mother to testify about the records. *Id.* at 543. However, the court said that would be discussed the following day, as court would be in session then. *Id.*

{¶ 90} Subsequently, during the cross-examination of Det. Lawson, the court

sustained the State's objection to a question about the texts. The court offered to allow the defense to proffer the evidence, but counsel elected to wait until after the end of Lawson's testimony. *Id.* at 571-575. Due to the illness of defense counsel, trial did not occur on the next day but resumed the day thereafter. At that time, the defense proffered the evidence as Defendant's Ex. E. The court accepted the proffer but said the exhibit would not go to the jury. *Id.* at 579-581. During this discussion, the court pointed out that Pulley had had this discovery in his possession and had had the chance to point it out to his counsel. *Id.* at 580-581. Nothing further was said about subpoenaing Mother, and the record lacks any evidence showing that an attempt was made to do so. The defense then rested without calling any witnesses. *Id.* at 599.

**{¶ 91}** Based on the record, we find that Pulley is precluded from asserting error on this ground because he invited any error. "The doctrine of invited error holds that a litigant may not "take advantage of an error which he himself invited or induced." *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. Under this doctrine, " ' "an appellant, in either a civil or a criminal case, *cannot attack a judgment for errors committed by himself or herself*; for errors that the appellant induced the court to commit; or for errors into which the appellant either intentionally or unintentionally misled the court, and for which the appellant is actively responsible." ' " (Emphasis added.) *State v. Davis*, 2d Dist. Montgomery No. 28796, 2021-Ohio-142, ¶ 27, quoting *Daimler/Chrysler Truck Fin. v. Kimball*, 2d Dist. Champaign No. 2007-CA-07, 2007-Ohio-6678, ¶ 40. (Other citation omitted.)

{¶ 92} For example, a defendant has been precluded from raising error arising from the fact that he was convicted for felonious assault (a charge for which he was not indicted), because his counsel asked for a jury instruction on that charge. *State ex rel. Beaver v. Konteh*, 83 Ohio St.3d 519, 520, 700 N.E.2d 1256 (1998). *See also State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 269-279 (defendant could not object to the fact that a jury was allegedly "tainted" by removal of a juror because his attorney asked that the juror be removed); *State v. Woodruff*, 10 Ohio App.3d 326, 327, 462 N.E.2d 457 (2d Dist.1983) (defendant cannot assign error to the trial court's admission of polygraph results when he introduced them through his own witness). In *Woodruff*, we noted that "the rule of 'invited error,' a corollary of the principle of equitable estoppel, prohibits a party who induces error in the trial court from taking advantage of such error on appeal." *Id.*

{¶ 93} In *State v. Anderson*, 2d Dist. Montgomery No. 1983-CR-1344, 1984 WL 3846 (Sept. 5, 1984), two defense witnesses testified during a bench trial that the defendant had acted in self-defense. However, the State produced rebuttal evidence showing the witnesses fabricated their stories at the behest of the defendant's brother; the witnesses then recanted when the court recalled them. *Id.* at *1. On appeal, the defendant alleged that the trial court had erred in overruling his motion for a mistrial after the false testimony was revealed. *Id.* at *2. Due to evidence that the defendant was aware of the witnesses' intent to lie and was party to the perjury, we applied the invited error doctrine and found the defendant was estopped from asserting the assignment of error. *Id.*

{¶ 94} We have reviewed the proffered exhibit, and the printed text messages appear to have been obtained from Pulley's phone, as Pulley was listed as the "Outgoing" participant. Because Pulley would have been aware of the content of his own text messages (and Mother's alleged replies) from the time they were apparently made during July and August 2020, there was no conceivable reason for his failing to raise the issue until nearly the end of trial in May 2022. Pulley had been represented by counsel for many months and could have alerted counsel to a possible alternate basis for the child's injuries and supporting evidence. He chose not to do so. Whether one wants to call this invited error, equitable estoppel, or waiver, Pulley's failure to do so prevents this issue from being considered on appeal.

{¶ 95} Even if we were to consider this point, perhaps for plain error, the trial court did not err. Evid.R. 901 governs authentication, and "Evid.R. 901(A) requires, as a condition precedent to the admissibility of evidence, a showing that the matter in question is what it purports to be." *State v. Simmons*, 2d Dist. Montgomery No. 24009, 2011-Ohio-2068, ¶ 12. "The authentication threshold is low, meaning that the party seeking to introduce the disputed evidence need only demonstrate 'a reasonable likelihood that the evidence is authentic.' " *State v. Shropshire*, 2d Dist. Montgomery No. 28659, 2020-Ohio-6853, ¶ 11, quoting *State v. Yuschak*, 2016-Ohio-8507, 78 N.E.3d 1210, ¶ 16 (9th Dist.). "Evid.R. 901(B) provides examples of numerous ways that the authentication requirement may be satisfied. The most commonly used method is testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1)." *State v. Renner*, 2d Dist. Montgomery No. 25514, 2013-Ohio-5463, ¶ 30, citing *Royse v. Dayton*, 195 Ohio App.3d

81, 2011-Ohio-3509, 958 N.E.2d 994, ¶ 27 (2d Dist.).

{¶ 96} " '[I]n most cases involving electronic print media, i.e., texts, instant messaging, and e-mails, the photographs taken of the print media or the printouts of those conversations are authenticated, introduced, and received into evidence through the testimony of the recipient of the messages.' " *State v. Irwin*, 2d Dist. Montgomery No. 26224, 2015-Ohio-195, ¶ 21, quoting *State v. Roseberry*, 197 Ohio App.3d 256, 2011-Ohio-5921, 967 N.E.2d 233, ¶ 75 (8th Dist.). The recipients of the messages here were allegedly Mother and Pulley. Pulley could have testified (but obviously was not required to do so), and he did not. Pulley also chose not to pursue the avenue of subpoenaing Mother. Without the testimony of at least one of these people, the participants in the text conversations would not be identified. In addition, while Det. Lawson reviewed a digital (not physical) download of the phones, he was not the person who conducted the download; that was Detective Bell. Trial Tr. at 541 and 571. Thus Bell would have been the person who could have authenticated the download. Again, Pulley never subpoenaed Bell; in fact this issue was never discussed.

{¶ 97} Finally, we disagree with Pulley that Mother's "testimony was the primary evidence establishing the time of injury for the State's theory of the offense." Appellant's Brief at p. 27. To the contrary, Pulley's statements during the police interview established the times of injury. Pulley admitted that he had injured A.G. on both days and demonstrated how the baby had been injured; he also indicated that no one had been present at these times. Therefore, Pulley's own statements were the primary source for establishing the time of injury.

{¶ 98} In light of the preceding discussion, the fourth assignment of error is overruled.


VII. Incorrect Jury Instruction

{¶ 99} Pulley's fifth assignment of error states that:

The Trial Court Erred by Charging the Jury with a Definition of Recklessly Which Was an Incorrect Statement of Law.

{¶ 100} Under this assignment of error, Pulley maintains that the trial court erred by using Ohio Jury Instruction ("OJI") C.R. 417.17, which defines acting "recklessly" and applies to crimes committed before March 23, 2015.   According to Pulley, this instruction imposes a lower standard than is required by law.   Before addressing this issue, we note the following standards that apply to error based on jury instructions.

{¶ 101} Crim.R. 30(A) provides that:

On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.   Opportunity shall be given to make the objection out of the hearing of the jury.

{¶ 102} Here, Pulley failed to object to the jury instructions in the trial court.   *See* Trial Tr. 604-607.   A party who fails to object "has forfeited all but plain error."   *State v. McAlpin*, 169 Ohio St.3d 279, 2022-Ohio-1567, 204 N.E.3d 459, ¶ 247, citing Crim.R. 52(B) and *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).   Crim.R. 52(B)

states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

{¶ 103} To establish plain error, "appellant must show that an error occurred, that the error was plain, and that the error affected his substantial rights," i.e., the error "affected the outcome of the trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 52, citing *Barnes* at 27. In the context of affecting a trial outcome, the accused must "demonstrate a reasonable *probability* that the error resulted in prejudice – the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 33, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

{¶ 104} The plain error rule also "applies to errors that were never objected to at trial, even if those errors can be classified as structural." (Citation omitted.) *McAlpin* at ¶ 66. Furthermore, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; [the Supreme Court of Ohio has] ' "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.' " ' " (Emphasis sic.) *Rogers* at ¶ 23, quoting *Barnes* at 27, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 105} Turning now to the issue before us, Pulley was charged with six counts: murder (proximate result of felonious assault with serious harm), felonious assault

(serious physical harm), murder (proximate cause of endangering children), endangering children (serious physical harm), involuntary manslaughter, and endangering children (parent – serious harm).

{¶ 106} Count One of the indictment charged Pulley with murder, i.e., causing A.G.'s death as a "proximate result of the offender's committing an offense of violence, to wit: FELONIOUS ASSAULT (SERIOUS PHYSICAL HARM), in violation of 2903.11(A)(1)." A violation of R.C. 2903.11(A)(1) is felonious assault. When the trial court instructed the jury on Count One and the predicate offense of felonious assault, it stated: "Before you can find the Defendant guilty of felonious assault, serious physical harm, you must find beyond a reasonable doubt that * * * Pulley knowingly caused serious physical harm to A.G." Trial Tr. at 653.

{¶ 107} Count Two charged Pulley with felonious assault, serious physical harm in violation of the same statute, i.e., R.C. 2903.11(A)(1). The court also instructed the jury, as before, that Pulley must have "knowingly caused serious harm to A.G." Id. at 655.

{¶ 108} Count Three was a murder charge with the predicate offense of endangering children (serious physical harm), "in violation of R.C. 2919.22(B)(1). This statute prohibits persons from abusing children and is a second-degree felony when it results in serious physical harm to the child. See R.C. 2919.22(E)(2)(d). With respect to the child endangerment charge, the court instructed the jury that Pulley must have recklessly abused a child. The court then defined "recklessly" as follows:

A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is

likely to cause a certain result or be of a certain nature. A person is heedless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist. Risk means a significant possibility as contrasted with a remote possibility that a certain result may occur or that certain circumstances may exist.

Trial Tr. at 657-658.

{¶ 109} Count Four of the indictment charged Pulley with child endangerment in violation of R.C. 2919.22(B)(1), and the culpable state, again, was acting recklessly. The court did not repeat the definition of acting recklessly but reminded the jury that it had already read the definitions contained in this charge. *Id.* at 659. Count Five charged Pulley with causing A.G.'s death as a proximate result of committing or attempting to commit the felony of endangering children (parent-serious harm), in violation of R.C. 2903.04(A). R.C. 2903.04(A) states that "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." Violations of this statute constitute involuntary manslaughter. Concerning the predicate crime, the court again used the above definition of acting recklessly with a slight variation. *Id.* at 661-662. Specifically, the last sentence of the definition added the following italicized words:

Risk means a significant possibility as contrasted with a remote *or even a significant* possibility that a certain result may occur or that certain circumstances may exist.

Trial Tr. at 662.

{¶ 110} Finally, Count Six of the indictment charged Pulley with endangering children in that Pulley "did recklessly create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support, which resulted in serious physical harm to the child," in violation of R.C. 2919.22(A). Again, the court described the state of mind as acting "recklessly" and stated that it had already read the definitions to the jury. *Id.* at 663.

{¶ 111} Thus, Counts One and Two required a culpable mental state of "knowingly," and the remaining four counts required a culpable mental state of "recklessly." Responding to Pulley's arguments, the State contends that any error would not have prejudiced Pulley, as the State was held to the higher culpable state of proving that Pulley acted knowingly for purposes of the felonious assault conviction in Count Two (and thus for the murder conviction in Count One). In addition, the State notes that it conceded at sentencing that the convictions in Counts One through Five should be merged. State's Brief at p. 26. Pulley did not respond to this argument in his reply brief, and we agree with the State. At sentencing, the State did agree that these offenses had to merge. Trial Tr. at 696. Pulley's counsel agreed as well, with the only disagreement being whether Count Six should also be merged. *Id.* at 668-669.

{¶ 112} If the jury concluded that Pulley acted knowingly with respect to the counts that pertained to A.G.'s murder and the predicate offense, it is hard to see how the jury did not also conclude that Pulley had acted recklessly, regardless of definition, since that is a lesser culpable state that "knowingly." *Compare* R.C. 2901.22(B) and (C). In fact,

R.C. 2901.22(E) specifically states that "[w]hen recklessness suffices to establish an element of an offense, then knowledge or purpose is also sufficient culpability for such element." Consequently, not only was there no plain error, there was no error. The court also merged the first five convictions, consistent with the parties' discussion. Trial Tr. at 699.

{¶ 113} The trial court did find that Count Six did not merge with the other offenses due to a separate animus for the injuries occurring on the first day, i.e., August 19, 2020. *Id.* at 700-701. Again, this count required a mental state of having acted recklessly. As currently constituted, R.C. 2901.22(C) provides that:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 114} This statute was amended in 2014, with an effective date of March 23, 2015. *See* Am. S.B. 361, 2014 Ohio Laws 194, which enacted R.C. 2901.20 and amended R.C. 2901.21 and R.C. 2901.22. Before amendment, R.C. 2901.22(C) read as follows:

A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is

likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

{¶ 115} The pre-amendment content is consistent with the trial court's instructions, which means that the instructions did not contain the current definition. This would only be pertinent to Count Six, which the court did not merge.

{¶ 116} According to the Bill Analysis of the Ohio Legislative Service Commission, the bill "[m]odifies current law's mental state of 'recklessly' by providing that, with heedless indifference to the consequences, a person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result instead of a known risk, as under current law." Legislative Service Commission -2- Am. S.B. 361 as Passed by the Senate, http://archives.legislature.state.oh.us/lsc/analyses130/s0361-ps-130.pdf (accessed on Aug. 12, 2023).

{¶ 117} In response to this issue, the State contends that whether the former definition imposed a lower standard of culpability appears to be a matter of first impression. State's Brief at p. 26. The State further argues that, nonetheless, nothing indicates that the former definition of "recklessly" contains a lower standard or that the State's burden of proof was lessened as Pulley maintains. *Id.*

{¶ 118} Contrary to the State's position, this is not a case of first impression. We did mention the amendment to R.C. 2901.22(C) in a case decided shortly after the amendment. *See State v. Webber*, 2015-Ohio-2183, 35 N.E.3d 961 (2d Dist.). In

*Webber*, we considered whether a father had acted recklessly for purposes of child endangerment by giving his 16-month-old child an adult sleep medication before putting her to bed. In the morning, the child was found dead, tangled in her blanket, and the father was convicted of involuntary manslaughter based on the predicate offense of child endangerment. *Id.* at ¶ 3 and 4.

{¶ 119} We applied the former definition of recklessly and rejected the father's claim that his actions were negligent rather than voluntary. *Id.* at ¶ 5-35. We noted that the father "administered ZzzQuil to the child without consulting a doctor, when that medication was labeled as contraindicated for young children, and then placed the child to sleep in a crib that was very crowded with bedding and other soft objects. Moreover, Webber's initial denials to the sheriff's deputies and coroner's investigator about administration of the drug to the child, because he was 'scared of getting into trouble,' suggest that he had perceived that there was risk to the child associated with the use of the medication. He also had not consulted with the child's pediatrician about the use of diphenhydramine for any purpose, despite very recent visits to the doctor's office for illnesses." *Id.* at ¶ 34.

{¶ 120} In a footnote, we discussed the amendment to R.C. 2901.22(C), noting that "[t]he changes appear to be for clarity but, if anything, lower the standard by substituting a 'substantial and unjustifiable risk' in place of a 'known risk.' " *Id.* at ¶ 10, fn. 1. While this comment was dicta, we also have previously agreed with it in a case applying the amended definition. *See State v. Hypes*, 2d Dist. Clark No. 2018-CA-110, 2019-Ohio-4096, ¶ 21, fn. 2. We continue to agree. In fact, the amendment also

eliminated the word "perversely," which suggests a high level of intent. Consequently, by giving the outdated jury instruction, the trial court actually held the State to a higher standard of proof, not a lower one. Pulley, therefore, was not prejudiced at all, and no error or plain error occurred. Accordingly, the fifth assignment of error is overruled.

## VII. Allied Offenses

{¶ 121} Pulley's sixth assignment of error states that:

The Trial Court Erred by Convicting Appellant of Allied Offenses of Similar Import.

{¶ 122} Under this assignment of error, Pulley argues that the trial court erred by failing to merge Count Six with Count One (the murder conviction for which the State elected sentencing). Count Six alleged that between August 19 and 20, 2020, Pulley did "recklessly create a substantial risk to the health or safety of [A.G.] by violating a duty of care, protection, or support, which resulted in serious physical harm to the child" in violation of R.C. 2919.22(A) (endangering children). According to Pulley, there was no evidence of serious harm to A.G. on August 19, 2020, i.e., no behavior that suggested "substantial suffering and intractable pain." Appellant's Brief at p. 31. Pulley further contends that, because of this, the convictions on both counts must have been based on the events of August 20, 2020, and therefore were committed by the same animus and conduct and resulted in the same harm.

{¶ 123} Before sentencing, the State filed a memorandum urging the court to find a separate animus for Count Six because injuries to A.G. occurred on two separate days

and the culmination resulted in serious physical harm. In responding, Pulley argued that the only evidence of injury on August 19, 2020, was bruising. During the sentencing hearing, the trial court found a separate animus for Count Six, due to the bruising of A.G., Mother's concern about the child on August,19, and the fact that a five-week baby cannot communicate pain in a manner other than what a mother is able to observe. Trial Tr. at 700.

{¶ 124} Under the Double Jeopardy Clause of the Fifth Amendment, and as extended to Ohio citizens by the Fourteenth Amendment, "multiple punishments for the same offense" are precluded. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10. Ohio's protection against multiple punishments is codified in R.C. 2941.25, which provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 125} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three

questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *Ruff* at ¶ 31.

**{¶ 126}** "Merger is a sentencing question, not an additional burden of proof shouldered by the state at trial," and the defendant has the burden to establish entitlement to this protection. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18. De novo review applies to decisions on whether to merge certain offenses as allied offenses under R.C. 2941.25. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1.

**{¶ 127}** Here, there is no question that Pulley injured A.G. on separate occasions. Pulley admitted that to the police and to Mother. Although his account differed on how the injuries on August 19 occurred, he dropped either a cell phone or game controller on A.G.'s head (explaining one bruise on A.G.'s forehead) and A.G. also rolled off the couch or fell out of his hands onto the floor. Trial Tr. at 435-436 and 547.

**{¶ 128}** Consistent with Count Six of the indictment, R.C. 2919.22(A) provides that "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2919.22)(E)(2)(c) further states that "[i]f the violation is a violation of division (A) of this

section and results in serious physical harm to the child involved," it is a felony of the third degree.   This is the crime for which Pulley was convicted.

{¶ 129} R.C. 2901.01(A)(5) defines "serious physical harm to persons."   In instructing the jury on serious physical harm, the trial court referred to several types of harm reflected in R.C. 2901.05(A)(b)-(e).   Trial Tr. at 659.   These include:

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

The trial court's merger decision relied on the final definition, R.C. 2901.01(A)(5)(e).   *See* Trial Tr. at 700.

{¶ 130} According to the evidence, including Pulley's statements (which we have already mentioned), A.G. sustained separate and distinct injuries (bruises) on the right side of her forehead and on the left side of her head extending down to her temple on August 19, 2020.   There was also a hint of bruising at the side of her nose when she was admitted to DCH.   Trial Tr. 260-261, 312, 313, and 325.   The injury to the back of A.G.'s head (a scrape mark and large bruise) was another separate injury caused by blunt force

trauma and occurred the following day. This particular injury, including the skull fracture, would have had immediate impact and was catastrophic. *Id.* at 262-264 and 271-272.

{¶ 131} While both sets of injuries involved the same victim, they occurred far apart in time. They were not committed during the same transaction or during an ongoing event. For example, in *Ruff*, the defendant was convicted of rape and aggravated burglary in connection with three different women. The issue was whether the aggravated burglary conviction for each victim should be merged into the rape conviction for that particular victim. *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 1-6. The trial court sentenced the defendant for both convictions pertaining to all three victims. However, the court of appeals found that "because the conduct relied upon to establish the rapes was the same conduct used to establish the physical-harm element of the aggravated burglaries, the offenses were allied and subject to merger." *Id.* at ¶ 8. After outlining the correct analysis for evaluating allied offenses, the Supreme Court of Ohio remanded the case "for the court of appeals to consider whether the import of the aggravated burglary and the import of the rape were similar or dissimilar in each of the three separate events." *Id.* at ¶ 29.

{¶ 132} On remand, the court of appeals still held that the convictions should be merged because "[t]he element of physical harm for each aggravated burglary was established by Ruff's rape of the victim. The harm that resulted from the rape of each victim was same harm that resulted when each burglary escalated to aggravated burglary. Thus, the harms were not 'separate and identifiable.'" *State v. Ruff*, 1st Dist. Hamilton No. C-120533, 2015-Ohio-3367, ¶ 19. Again, however, the crimes against A.G. were

committed separately; they were not part of the same transaction. To put it another way, if the injuries A.G. sustained on the second day had never taken place, Pulley could still have been charged with a crime based on having injured A.G. on August 19, 2020.

**{¶ 133}** In remarking on A.G.'s pain on August 19, 2020, the trial court appears to have focused on *Ruff's* first question, which is whether the offenses were "dissimilar in import or significance." With respect to this point, the court stated in *Ruff* that "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26. Clearly, harm was caused to A.G. as the result of the two separate offenses, because she was bruised in two areas on August 19, 2020. Nonetheless, satisfaction of this factor was not required, because "an affirmative answer to *any*" of the three considerations in *Ruff*, i.e., conduct, animus, and import, "will permit separate convictions." (Emphasis added.) *Id.* at ¶ 31. We also note that the extent of A.G.'s pain or injury is not relevant in this context; it is more properly considered in connection with a manifest weight issue. However, Pulley did not make such an argument.

**{¶ 134}** Accordingly, the trial court did not err in refusing to merge Count Six with the other offenses. The sixth assignment of error, therefore, is overruled.

## VIII.   Sufficiency and Manifest Weight of the Evidence

**{¶ 135}** Pulley's seventh assignment of error states that:

Appellant's Convictions Are Not Supported by Sufficient Evidence to

Prove Guilt Beyond a Reasonable Doubt and Are Against the Manifest

Weight of the Evidence.

{¶ 136} Under this assignment of error, Pulley contends that his convictions were not supported by sufficient evidence because the experts disagreed on the number of injuries sustained and could not identify the mechanism of the injury. For the same reasons, Pulley contends that his convictions were against the manifest weight of the evidence.

{¶ 137} "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law." *State v. Cherry*, 171 Ohio App.3d 375, 2007-Ohio-2133, 870 N.E.2d 808, ¶ 9 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In this situation, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶ 138} Furthermore, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, * * * [t]he decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 139} In contrast to a sufficiency analysis, "[w]hen a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *Thompkins* at 387. "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 140} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord* State v. Wilson, 2d Dist. Montgomery No. 29349, 2023-Ohio-27, ¶ 72. As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency."

(Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 141} The two counts of murder were based on R.C. 2903.03(B), which provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." As previously noted, the predicate felony for the first murder count was felonious assault (serious harm), in violation of R.C. 2903.11(A)(1), and the predicate felony for the other murder count was R.C. 2919.22(B)(1) (endangering children).

{¶ 142} Having reviewed the record, and based on our prior discussion, we find no merit in Pulley's arguments. The evidence against Pulley was overwhelming. As indicated, Pulley admitted that he had injured A.G. on both August 19 and 20, 2020, and that he had been alone with A.G. The State presented testimony from a coroner as well as a doctor who attended A.G. while she was a patient at DCH. Both experts testified that the injuries to A.G. were catastrophic, would not have been caused accidentally, were due to blunt force trauma, and resulted in A.G.'s death. Trial Tr. at 272, 276-277, 279-280, 281, 316-320, 322, and 338-339.

{¶ 143} A.G. was five weeks old and had no health issues before being placed in Pulley's care. While Pulley's varying stories attempted to minimize his actions and the child's injury, A.G. suffered catastrophic head injuries while in his care and died as a result. A.G. could not possibly have injured herself. Furthermore, as the State notes, it did not have to prove the precise way in which Pulley injured A.G.; it could rely on circumstantial evidence, which was abundant. *Compare State v. King*, 179 Ohio App.3d

1, 2008-Ohio-5363, 900 N.E.2d 645, ¶ 44 (2d Dist.) ("despite the fact that there was no eyewitness to the actual injury, the evidence supports a finding that the harm was not caused by an accidental fall following a seizure, or by an injury earlier in the day. To the contrary, the evidence supports a finding that the injury occurred during the time that [defendant] had exclusive care and control of [the child].").

**{¶ 144}** "Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph one of the syllabus. As noted, the required state of mind for these charges was that Pulley acted either knowingly or recklessly. "Recklessness, like any other essential element of an offense, may be proved through circumstantial evidence." *State v. Jones*, 9th Dist. Summit No. 25986, 2012-Ohio-4256, ¶ 6, citing *State v. Hatfield*, 121 Ohio St.3d 1201, 2009-Ohio-353, 901 N.E.2d 813, ¶ 19-24. Likewise, a state of acting "knowingly" or with knowledge can be established through circumstantial evidence. *E.g., State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 43 (8th Dist.); *State v. Terry*, 186 Ohio App.3d 670, 2010-Ohio-1604, 929 N.E.2d 1111, ¶ 22 (4th Dist.) ("[k]nowledge, like all kinds of intent, can be inferred from circumstantial evidence").

**{¶ 145}** Accordingly, Pulley's convictions were not based on insufficient evidence and were not against the manifest weight of the evidence. The seventh assignment of error is overruled.

IX.   Ineffective Assistance of Counsel

{¶ 146} Pulley's eighth assignment of error is that:

Appellant Was Prejudiced by the Denial of His Right to Effective Assistance of Counsel, in Violation of His Rights Under the Sixth and Fourteenth Amendments to the United States Constitution.

{¶ 147} In connection with this assignment of error, Pulley raises four ways in which trial counsel was allegedly ineffective: (1) failing to argue for individual examination of the text messages; (2) failing to subpoena Mother to be recalled or to subpoena another witness who could provide a foundation for the messages; (3) failing to be aware of the specific content of the text messages; and (4) failing to object to the incorrect statement of law about acting recklessly, which resulted in a lesser burden on the State. Appellant's Brief at p. 34.

{¶ 148} To succeed on ineffective-assistance claims, a defendant must establish: (1) trial counsel's deficient performance; and (2) the deficient performance caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. In order to prove deficient performance, a defendant must show that "counsel's performance fell below an objective standard of reasonable representation." *Strickland* at 688. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent

challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." *Id.*

**{¶ 149}** Courts reviewing ineffective-assistance claims "will not second-guess trial strategy decisions" and " 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998), quoting *Strickland* at 689. "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992), citing *Strickland* at 687-689.

**{¶ 150}** We have already rejected Pulley's argument about the jury instruction on recklessness and will not consider that matter further. Moreover, we have already said that Pulley invited any error by failing to raise the text issue until the middle of trial when, in fact, he would have been well-aware of any of Mother's statements since he was a party to these conversations in August 2020 – many, many months before trial. Furthermore, Pulley placed his trial counsel in an impossible position by failing to mention this evidence until the State was almost ready to conclude its case. The alleged evidence was also somewhere within around 5,000 pages of printed materials that were made available a few weeks before trial. At that time, Pulley was representing himself (by his own choice), and while standby counsel indicated he was prepared for trial, it would be unreasonable to expect that counsel would wade through 5,000 pages of information, when counsel was not even aware of what he would be expected to find.

{¶ 151} The point is that Pulley knew about all of this information and could have alerted his standby (later trial) counsel of these facts if they were indeed relevant. However, he chose not to do so, following a course with which the trial court was familiar, i.e., gamesmanship. This tactic was discussed during the discussions in the middle of trial. Trial Tr. at 533-543. In this regard, the court noted, among other things that "Look, it's my understanding the Defendant has had these in his possession for over a year since Mr. VanNoy was representing him, and specifically, the Defendant had the printouts when the State's other efforts to provide discovery were not sufficient. Defendant had these. Chose to give them to his dad instead of his attorney or his standby counsel, and then, now, in the middle of trial, suggests that the State has engaged in some nefarious behavior." *Id*. at 533. The court also remarked that this appeared to be another "tactical effort" by Pulley and his father to create some issue, and that this effort had been discussed all along before trial. *Id*. at 540.

{¶ 152} In addition, the record does not contain any evidence about decisions whether or not to recall Mother or to subpoena other witnesses. Such decisions could have been based on trial strategy, which we will not second-guess. Consequently, there is no merit to the eighth assignment of error, and it is overruled.

## X. Cumulative Error

{¶ 153} Pulley's final assignment of error is as follows:

> The Cumulative Effect of the Errors Set Forth Herein Deprived Appellant of His Constitutional Rights to a Fair Trial.

{¶ 154} Under this assignment of error, Pulley argues that the cumulative effect of errors, including failing to present relevant evidence at trial, warrants reversal of the judgment. "*State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *DeMarco* at 196-197.

{¶ 155} Because we have found no error, no basis exists for applying the cumulative error doctrine. Consequently, the ninth assignment of error is overruled.

## X. Conclusion

{¶ 156} All of Pulley's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and EPLEY, J., concur.